SIGNED: January 6th, 2022

THIS ORDER HAS BEEN ENTERED ON THE DOCKET.
PLEASE SEE DOCKET FOR ENTRY DATE.

_____
**Paul M. Black**
**UNITED STATES BANKRUPTCY JUDGE**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| TARA RETAIL GROUP, LLC<br>   Debtor. | Case No. 1:17-bk-00057 |
| COMM 2013 CCRE12 CROSSINGS MALL ROAD, LLC<br>   Plaintiff, | |
| v. | |
| TARA RETAIL GROUP, LLC<br>   Defendant, Cross Plaintiff<br>   and Third-Party Plaintiff, | Adversary Proceeding<br>No. 1:21-ap-00001 |
| v. | |
| COMM 2013 CCRE12 CROSSINGS MALL ROAD, LLC<br>   Cross Defendant and | |
| WELLS FARGO COMMERCIAL MORTGAGE SERVICING<br>   Third-Party Defendant. | |

## MEMORANDUM OPINION

This matter comes before the Court on cross motions for summary judgment filed by the Defendant, Cross Plaintiff and Third-Party Plaintiff and Reorganized Debtor, Tara Retail Group, LLC ("Tara" or "Debtor"), and by the Plaintiff, Comm 2013 CCRE12 Crossings Mall Road,

LLC ("Comm 2013"), and Third-Party Defendant, Wells Fargo Commercial Mortgage Servicing ("Wells Fargo").  Comm 2013 and Wells Fargo are sometimes referred to herein collectively as the "Lending Parties."  This is the latest dispute in a long running battle between Tara and the Lending Parties, which has resulted in nearly fifteen hundred docket entries, tens of thousands of pages of pleadings and exhibits, multiple adversary proceedings, numerous contested matters, three failed mediations, and several appeals.  By last count, a Westlaw search revealed fifteen (15) written opinions generated in connection with this bankruptcy case, many of which are between the Debtor and the Lending Parties.  This case has been fraught with hostility among the parties, and with sometimes what can only charitably be described as hard-ball gamesmanship — if not worse.

## PRELIMINARY SUMMARY

The genesis of the current dispute arises from the Court's confirmation opinion and order, entered by the Honorable Patrick M. Flatley, on January 27, 2020 (collectively the "Confirmation Opinion").  In short, the primary unanswered issue is what loan and security documents control the relationship between Tara and the Lending Parties post-confirmation.  The Court will address that issue in more detail below.  Nevertheless, the road map of how this case reached this point is worthy of some explanation.

Judge Flatley retired on March 11, 2020.  After the confirmation order was entered, but before Judge Flatley retired, the Debtor filed a motion to alter or amend judgment on February 5, 2020, and the Lending Parties filed on February 10, 2020 a motion for clarification of the terms of the confirmation order.  ECF 1326, 1345.  The parties argued the motions before Judge Flatley the day before he retired, and at that hearing he advised the parties that it was unlikely he would rule on the issues raised before his retirement was effective.  He did suggest, however, that the

2

parties attempt to mediate the dispute before United States Magistrate Judge Robert W. Trumble in the Northern District of West Virginia. Judge Trumble is an experienced mediator and, prior to taking the bench, was a former Chapter 7 bankruptcy trustee. With this knowledge and experience, Judge Trumble seemed the perfect mediator. Unfortunately, that mediation was unsuccessful.[1]

Judge Flatley's successor could not hear the case, having previously been involved with it through the Office of the United States Trustee. United States District Judge Frank W. Volk was assigned to the case after Judge Flatley's retirement, but Judge Volk was hearing the bankruptcy case as a United States District Judge after serving as the United States Bankruptcy Judge for the Southern District of West Virginia. Judge Volk was confirmed as a United States District Judge on October 16, 2019, and he continued to hear bankruptcy cases until his successor was appointed. While Judge Volk considered the clarification motion during his tenure on the case, he did not issue a decision or written opinion. His successor as a bankruptcy judge also had a conflict with this case, and the undersigned was designated to hear the matter effective September 14, 2020. By order entered September 24, 2020, the Court entered what is now referred to as the "Clarification Order."[2] Unfortunately, despite the Court's ruling, the parties continue to disagree over the Confirmation Opinion and Clarification Order's meanings as well as the governing post-petition loan documents.

---

[1] It appears a mediation was held with Chief United States Bankruptcy Judge Jeffery A. Deller of the Western District of Pennsylvania in November 2017 pertaining to contested claims. That mediation, too, was unsuccessful. ECF 453. It appears that this mediation involved other claims and parties in addition to Comm 2013 and the Debtor, not just the current combatants.

[2] The initial order of confirmation was appealed to the United States District Court for the Northern District of West Virginia. No separate appeal was taken from the Clarification Order.

On February 4, 2021, Comm 2013 filed a declaratory judgment complaint against the Debtor initiating the current adversary proceeding. In paragraph 50 of the Complaint, Comm 2013 alleges as follows:

> An actual, present, and justiciable controversy has arisen between the Secured Creditor and Debtor concerning (a) the interpretation and implementation of the Plan; (b) the Loan terms in effect post-confirmation; (c) the legal relationship between the Secured Creditor and the Debtor, including Secured Creditor's right to exercise state-law remedies under the Loan Documents following the Defaults; (d) the scope of the Post-Confirmation Injunction and its application to Secured Creditor's enforcement of the Defaults, and (e) whether the Lien Release is a legal nullity.

A.P. ECF 1. The "Lien Release" referred to is a document dated February 5, 2020 prepared and filed by counsel for the Debtor and recorded in the land records of Kanawha County, West Virginia on February 6, 2020 releasing a $13,650,000.00 Deed of Trust securing the Lending Parties.[3] Counsel for the Debtor represented in the Lien Release that the release of the Deed of Trust was authorized by the Confirmation Opinion, a fact the Lending Parties vehemently dispute. A later document dated February 18, 2021 executed by the Debtor captioned "Reinstatement of Deed of Trust by Bankruptcy Court Order" was recorded in the Kanawha County, West Virginia land records on February 25, 2021. The reinstatement document provided, in part, as follows:

> **WHEREAS,** following a motion filed by COMM2013 on February 10, 2020, seeking to clarify, amend or reconsider the order confirming Tara's Chapter 11 plan, the Bankruptcy Court entered a Memorandum Opinion and Order on September 24, 2020 (the "September 24, 2020 Memorandum Opinion and Order"), clarifying that Tara's modification of COMM2013's claim against Tara would continue to be secured by the Deed of Trust. A true and correct copy of the September 24, 2020 Memorandum Opinion and Order is attached hereto and made a part hereof as Exhibit A.

---

[3] The Lien Release reflects it was prepared by Jonathan Nicol of Kay Casto & Chaney PLLC. Steven Thomas, the Debtor's lead counsel, represented to the Court the Lien Release was prepared by Nicol at his direction.

4

A.P. ECF 5, Ex. C.  Once the Clarification Order was entered, the Debtor knew the Court's expectation that the existing security documents remained effective.  More significantly, for over a year, there appears to have been nothing in the land records of Kanawha County, West Virginia to reflect that the substantial indebtedness the Debtor owed to the Lending Parties was secured by the Debtor's real estate.[4]  When the Court references hard-ball gamesmanship, or worse, this is a prime example.[5]

After Comm 2013 filed the declaratory judgment action, the Debtor filed a counterclaim against Comm 2013 and a third-party complaint against Wells Fargo demanding that those parties turn over funds paid by tenants pre-petition so that those funds could be applied against the debt to the secured lender.  Comm 2013 and Wells Fargo have denied that the Debtor is entitled to that relief.  Both the Debtor and the Lending Parties have filed motions for summary judgment, which were argued August 19, 2021.  At oral argument, the Court suggested that the parties once again try mediation, and the Honorable Keith L. Phillips, United States Bankruptcy Judge for the Eastern District of Virginia, was appointed by the Fourth Circuit as a judicial settlement officer.  The case was mediated over multiple days in October and November, 2021, and on November 16, 2021, Judge Phillips filed a notice of impasse and the mediation concluded.  A.P. ECF 53.  The summary judgment motions are now ripe for resolution.

---

[4] Comm 2013's amended proof of claim filed in this case lists the claim as secured in the amount of $13,100,000.00, and unsecured in the amount of $5,914,111.65.  POC 2-3.

[5] The Court notes that the same counsel for the Debtor who was involved in releasing the deed of trust also replied to the Lending Parties' notice of default by copying U.S. Senators Shelley Moore Capito and Joe Manchin, and U.S. Representatives David McKinley, Alex Mooney, and Carol Miller.  *See* Declaration of Steven L. Thomas at Ex. D attached to Ex. 5.  A.P. ECF 20.  Other than to potentially ratchet up pressure on the Lending Parties from outside sources unrelated to this bankruptcy case, what this was intended to accomplish is unclear.

CONCLUSIONS OF LAW

This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order of the United States District Court for the Northern District of West Virginia. This Court further concludes that this matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (L), and (O).

I. The Applicable Legal Standard

Federal Rule of Civil Procedure 56, applicable in adversary proceedings through Federal Rule of Bankruptcy Procedure 7056, states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citing *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Rossignol*, 316 F.3d at 523 (citing *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)). *See In re Terry Properties, LLC*, No. 16-71449, 2017 WL 507277, at *3 (Bankr. W.D. Va. Feb. 3, 2017), *aff'd*, No. 16-71449, 2017 WL 3736772 (W.D. Va. Aug. 30, 2017).

II. The Issues in Dispute

A. The Governing Loan Documents

In addressing the current dispute between the parties, it is necessary to lay some factual groundwork. The following facts are taken in large part from Judge Flatley's Memorandum

Opinion of January 27, 2020. The Debtor owns The Crossings Mall in Elkview, West Virginia. It is a multi-tenant commercial property encompassing about 200,000 square feet. Public access to it is limited to a single bridge—formerly spanning a culvert—over Little Sandy Creek. The Debtor purchased The Crossings Mall in 2013 after the then-owner, Interstate Properties, LLC, filed a Chapter 11 bankruptcy in the Northern District of Georgia. To finance its purchase of The Crossings Mall, the Debtor obtained a loan from UBS Real Estate Securities, Inc. ("UBS"). UBS agreed to finance the Debtor's $13,650,000.00 purchase on certain conditions. In that regard, the Debtor executed a Loan Agreement and Promissory Note, the repayment of which the Debtor secured by executing a Deed of Trust and an Assignment of Leases and Rents. Additionally, the Debtor executed a Cash Management Agreement and Management Agreement. ECF 1313, at p. 1. UBS subsequently assigned the loan to U.S. Bank N.A., as trustee for Comm2013 CCRE12 Commercial Mortgage Pass Through Certificates. In 2017, that entity assigned the loan to Comm 2013. Wells Fargo services the loan and administers certain escrow accounts consistent with its role in that regard. *Id.* at p. 2.

Among other subaccounts created by the Original Loan Agreement, Wells Fargo maintains an account for Capital Expenditures, which the Loan Agreement defines as "the amounts expended for items required to be capitalized under GAAP (including expenditures for replacements, building improvements, major repairs, alterations, tenant improvements and leasing commissions)." Specifically, the Debtor was to deposit $3,493.62 monthly into the Capital Expenditure Account, and Section 6.4.2 of the Loan Agreement controls the release of those funds. It provides, among other things, that the Defendants "disburse to [the Debtor] the Capital Expenditure Funds upon satisfaction by [the Debtor]" of various conditions. Among those conditions is that the Lending Parties "shall have received

an Officer's Certificate (A) stating that all items to be funded by the requested disbursement are Capital Expenditures, [and] (B) stating that all Capital Expenditures to be funded by the requested disbursement have been completed in a good and workmanlike manner . . . ." ECF 1313, at p. 2. In January 2016, the Debtor's management company obtained a quote for $9,200.00 to "replace a drop inlet culvert at the entrance of the Crossings Mall in Elkview." In a subsequent email to Wells Fargo, the Debtor's property manager related that if this matter "is not resolved immediately the only entrance to the center could collapse."  Notably, the Debtor had not yet effectuated the repair at the time its property manager requested the Capital Expenditure Funds. It was apparently unable to make the repair without use of the Capital Expenditure Funds.  On January 22, 2016, Wells Fargo responded that it first wanted an explanation of why rent rolls were below the expected receipts.  Collected rents were between $89,000 and $96,000 per month, and the scheduled rent was $128,420.80.  Ultimately, Wells Fargo did not release the requested funds for the culvert repair.

In June 2016, due to a flood of historic proportions, significant rainfall caused debris and water to accumulate at the culvert bridge providing access to The Crossings Mall. Ultimately, Little Sandy Creek overflowed its banks and flooded bordering properties before washing away the culvert bridge.  After the flood, the Debtor's tenants were unable to operate, and rents eventually stopped.  The Debtor was therefore unable to service its debt to Comm 2013, which ultimately filed a civil action against the Debtor in the District Court for the Southern District of West Virginia, in which it sought the appointment of a receiver.  That precipitated the Debtor's bankruptcy case.  During this case, the Debtor successfully restored access to its property with the construction of a bridge spanning Little Sandy Creek. To fund the construction, it obtained post-petition financing from the entities employed to build the

8

bridge who, in turn, obtained super-priority over Comm 2013's secured interest in certain rents payable from Kroger and Kmart.  They agreed to undertake the construction with no payment from the Debtor until tenants resumed operating.  Specifically, the Debtor agreed to repay the post-petition financing with rents generated from Kroger and Kmart.  Notably, the Debtor also recently obtained a favorable resolution of its claim against Emerald Grande, LLC, resulting in a partial reimbursement of the cost of the bridge construction.  Both the Debtor and Comm 2013 solicited acceptances of their respective plans.

Ultimately, the overwhelming majority of claimants, including the many individuals affected by the flood and lack of access to The Crossings Mall, voted to accept the Debtor's proposed plan.  Specifically, sixty-eight of seventy individuals in Class Three, and the three tenant claimants with allowed claims, which voted in Class Two, accepted the Debtor's plan.  Comm 2013 itself is the only entity with an allowed claim that voted to accept its own competing plan.  In May 2019, the Court convened a confirmation hearing over two nonconsecutive days.   In that regard, the Court heard testimony from several witnesses, including representatives from the Debtor and Comm 2013 and experts that opined as to whether the Debtor's proposed plan was feasible and whether the Debtor proposed an adequate interest rate for the repayment of Comm 2013's allowed secured claim.

The Court confirmed the Debtor's plan, and therein lies the rub.  In the Debtor's plan, the Debtor made at least two references to cancel the Original Loan Agreement and enforce a New Loan Agreement.  As noted by the Debtor, Section 4.1 of the Confirmed Plan states that "[p]ursuant to Section 5.8 of the Plan, on the Confirmation Date, the New Promissory Note and New Loan Agreement will be issued to Comm 2013, and the existing Promissory Note and Loan Agreement will be cancelled."  Additionally, Section 5.8 of the Plan states that "[o]n the

9

Confirmation Date, the Loan Agreement relating to the Class 1 Claim of Comm 2013 will be cancelled and discharged, without further act or action under any applicable agreement or Law, and the New Loan Agreement will be issued to Comm 2013." After testimony by an expert witness and over objection by Comm 2013, the Court stated in the Confirmation Opinion that "[s]imply put, while Comm2013 may be unhappy with the Debtor's proposed changes to the documents governing their relationship, the court does not perceive the changes to critically impair confirmation of the Debtor's plan. The court's focus here is not upon the marketability of the underlying trust to investors or the economic risk to which they are exposed but is on the potential reorganization of a seemingly viable economic enterprise." ECF 1313, at p. 10. The Debtor relied on this statement in its filings that the New Loan Agreement should be fully enforced.

After the plan was confirmed, Comm 2013 filed an appeal to the United States District Court for the Northern District of West Virginia.[6] Additionally, Comm 2013 filed a Motion to Clarify, Amend and/or Reconsider Confirmation Order with the Court. This resulted in the Clarification Order discussed above. In pertinent part, the Clarification Order provided as follows:

> Although perhaps implicit in the Debtor's plan, the Court neither perceived wholesale changes to the loan agreement or note, other than terms necessary to implement the confirmed plan, nor the Debtor requesting a release of existing security interests in favor of subsequent pledges. To the contrary, it appears the Court believed that the Debtor's modification of its relationship with Comm 2013 would be incorporated into existing security documents.

ECF 1411, at p. 5.

Part of what motivated the Court in the Clarification Order was its understanding of prior caselaw that "[t]he covenants to be included in the loan documents of a cramdown need not

---

[6] At the present time, the appeal is stayed by the District Court.

10

precisely track the covenants in the parties' existing loan agreement." *In re P.J. Keating Co.,* 168 B.R. 464, 473 (Bankr. D. Mass. 1994) (quoting *In re Western Real Estate Fund, Inc.,* 75 B.R. 580 (Bankr. W.D. Okla. 1987)); *see also In re Stratford Assocs. Ltd. P'ship,* 145 B.R. 689, 703 (Bankr. D. Kan. 1992) (finding that if a debtor could not modify loan documentation it would make the whole reorganization process unworkable). As stated in *In re American Trailer & Storage, Inc.*, "[t]he Court finds that the question of whether modification of loan documents is appropriate requires consideration of the following factors: (1) whether the proposed terms and covenants unduly harm the secured creditor with respect to its collateral position; and (2) whether the inclusion of terms and conditions from the pre-bankruptcy loan documents would unduly impair the debtor's ability to reorganize." 419 B.R. 412, 441 (Bankr. W.D. Mo. 2009). Without citing the relevant case law, Judge Flatley essentially made that finding in his Confirmation Opinion that the loan covenants may change upon reorganization. However, wiping out all existing security documents and replacing them with entirely new ones to fit the Debtor's desires seemed overboard to the Court's interpretation of the Confirmation Order and the record developed in the case.[7]

In fact, attached to the Plan confirmed by the Court was only a New Loan Agreement. The Plan attached the New Loan Agreement as Exhibit 2. ECF 831-1, at 69. Under the terms of the New Loan Agreement, "Note" means the Promissory Note described and defined in Article II of the Agreement. *Id*. at 97. Under Article II, Section 2.5 states that "[t]he Principal Amount of the Loan shall be evidenced by a promissory note from the Borrower . . . substantially in the form of Exhibit 2.5, attached hereto and incorporated by reference." The Confirmed Plan, however, does not include an attached Promissory Note. At Exhibit 2.5 of the Confirmed Plan,

---

[7] Pursuant to Federal Rule of Bankruptcy Procedure 9028 and Federal Rule of Civil Procedure 63, the Court certifies familiarity with the record in this case.

11

the only attachment is a cover sheet labeled "EXHIBIT 2.5— Promissory Note" with no other documents. *Id*. at 107.[8]

Where does that leave the parties? At the hearing on the motions for summary judgment, counsel for the Debtor conceded that based on the Clarification Order, the original deed of trust and security agreement, the original note, the original assignment of leases, and the original guaranty agreements *are not at issue*. The reinstatement document also acknowledges that the original deed of trust continues in effect. It is the Original Loan Agreement and cash management provisions that are the issue.

At the confirmation hearing of the plan confirmed, Judge Flatley had before him the New Loan Agreement as an exhibit to the plan. Specifically, the New Loan Agreement, attached to the Second Amended Plan as Exhibit 2, provided as follows:

> *Security for Loan*. The Loan and the Note shall be secured by a **valid, perfected and enforceable first priority lien on the Collateral** [with Collateral defined as the "real property . . . described in the Deed of Trust"] and entitled to the benefits of the other Loan Documents and agreements relating to Lender's interest in the Collateral.

New Loan Agreement, at Section 2.6 (emphasis added).[9]

---

[8] The Debtor acknowledged in a footnote in its memorandum of law in response to the Lending Parties' motion for summary judgment that it only attached the New Loan Agreement to the Confirmed Plan and that the Debtor's plan proposed to cancel the existing promissory note, deed of trust and other loan documents and enter into a new promissory note, new loan agreement, new deed of trust, and other loan documents. However, only the New Loan Agreement was attached to the confirmed plan and only the New Loan Agreement was considered by the Court at confirmation. The Debtor contends that these documents were filed with a prior plan, replaced by the Second Amended Plan. In fact, at the initial hearing on the clarification motion before Judge Flatley, counsel for the Debtor advised he had only just provided a proposed note and deed of trust to Comm 2013's counsel in connection with the confirmed plan the night before.

[9] The Court cannot reconcile this provision with the Lien Release. Even if there was to be a new deed of trust, the Court can envision no circumstance where there would have been a gap with nothing recorded in the land records to secure the Lending Parties. Further, the Court can find no provision in the confirmed plan that expressly provides that the Lending Parties will retain their liens, unless the loan agreement is read to do so as part of the plan. It appears Judge Flatley reached that conclusion in finding that the plan was fair and equitable under 11 U.S.C. § 1129(b)(2)(A)(i)(I). This would be consistent with paragraphs 1.66 and 13.10 of the Second Amended Plan.

12

It had no cash management component, and the parties seem to agree that if the old loan agreement and cash management provisions are still in effect, the Debtor is in default. *See* Declaration of Christopher P. Schueller, A.P. ECF 23, Ex. H. However, the Debtor further appears to be performing on its obligations post-petition as called for in its confirmed plan and Judge Flatley's opinion, with the possible exception of payment of post-confirmation, year 2020 real estate taxes and some additional covenants under the Original Loan Agreement. *Id.*[10]

One thing that Judge Flatley made abundantly clear in his opinion is that this Chapter 11 debtor is an enterprise worth having a chance to reorganize.[11] This Court agrees. If all the original security documents are in effect as the Debtor concedes, except the original loan agreement and cash management provisions, this Debtor appears to be in compliance with its confirmed plan. The loan terms should be adjusted to fit the terms of the confirmed plan, and the Clarification Order was not intended to disrupt that. With the benefit of hindsight, would (or should) this Court have put a finer point on that issue when it issued the Clarification Order? Yes, and it does so now.[12] Being new to the case, the Court concedes that at the time it issued the Clarification Order, it did not have a full appreciation of the level of animosity between the

---

[10] The Court can find no express obligation in the Lending Parties' deed of trust to pay real estate taxes against the property, which in the Court's experience is unusual, but both the old loan agreement and the new loan agreement each have obligations to do so. *Compare* Original Loan Agreement Section 4.1.2 *with* New Loan Agreement Section 3.1(c).

[11] Specifically, the Court observed "Comm2013 proposes to take title to the Debtor's property and liquidate its interest therein, but its liquidation in that regard will likely result in it receiving far less than under the Debtor's plan and will almost assuredly result in the end of the Debtor. Given a choice, the court finds that its discretion is better employed to promote the Debtor's reorganization, particularly when the Debtor's principals originally developed The Crossings Mall many years ago and the Debtor experienced its recent financial pressure only after a significant weather event that shuttered The Crossings Mall." ECF 1313, at p. 17-18.

[12] Federal Rule of Civil Procedure 60(a), made applicable by Federal Rule of Bankruptcy Procedure 9024, provides: "The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave." As no appeal was taken from the Clarification Order, this opinion and order is intended to supplement the Court's ruling on that issue.

parties, or the extreme level of contentiousness that exists in this case. The heavy lifting of a confirmation battle of competing plans having been resolved at trial, the Court believed some of these post-confirmation issues could be resolved without the Court's involvement. The Court was wrong in that regard. But, the Court notes that similar hurdles have had to be addressed by other courts.

For example, in *In re Charles Street African Methodist Episcopal Church of Boston*, Judge Bailey observed as follows:

> [the Lender] objects to the almost complete lack of covenants in the promissory notes and mortgages it would be given under the Plan. The parties are in agreement about the state of the law on this question. The Bankruptcy Code requires no particular set of covenants in restructured loans. The issue is whether the terms are fair and equitable, considering all the circumstances. The Court must consider "(1) whether the proposed terms and covenants unduly harm the secured creditor with respect to its collateral position; and (2) whether the inclusion of terms and conditions from the pre-bankruptcy loan documents would unduly impair the debtor's ability to reorganize." *In re Am. Trailer & Storage, Inc.,* 419 B.R. 412, 441 (Bankr. W.D. Mo. 2009). CSAME emphasizes the second prong, arguing that it would now be reasonable to expect that at the first technical breach of even the most minor covenant, [the Lender] would not act as a normal lender, but would accelerate and thus cause the Plan to fail; and CSAME further points out that before the deterioration in relations between the parties, [the Lender] showed little concern for the covenants. [The Lender] emphasizes the first prong, arguing that the standard covenants are so wholly lacking that its collateral position is severely compromised, especially because most relevant covenants would not here be satisfied.
>
> The Court agrees with CSAME that, in view of [the Lender's] conduct in this case and since its declaration of default, it should be expected that [the Lender] would use standard covenants for maximum leverage, beyond their intended purpose. The Court would insist that collateral be insured (with due regard for the fact that three of the six properties have virtually no value beyond that of their land) and that nonpayment be an event of default after a suitable grace period. Beyond that, the Court will consider other covenants provided they are fashioned in a manner acceptable to CSAME or to otherwise allay CSAME's valid concern.

*In re Charles St. Afr. Methodist Episcopal Church of Bos.*, 499 B.R. 66, 109–10 (Bankr. D. Mass. 2013).[13]

    Here, given the combativeness that has occurred over nearly five years of litigation in this Court and elsewhere, the Court has some of the same concerns as expressed by the court in the *Charles Street AME* case, i.e., that at the first hint of default, the lender would use that leverage to foreclose or otherwise move against the Debtor or the collateral security.  Nevertheless, there need to be loan covenants that are adequate to protect the lender, particularly as to taxes and insurance, that would not put the borrower into immediate default.  So long as the Debtor is performing under the New Loan Agreement that Judge Flatley had before him at confirmation, and the Debtor's insurance coverages are consistent with the coverages maintained pre-petition, the terms of the New Loan Agreement — coupled with the terms of the confirmed plan and the existing security documents (other than the Original Loan Agreement and the cash management provisions) — are sufficient to protect the Lending Parties in this case and provide the Debtor with a viable path to reorganization.

    B.  <u>Turnover of Property</u>

    In its counterclaim and third-party complaint, Tara has represented that there is over $140,000.00 in a Wells Fargo account that constitutes funds remitted by the Debtor's tenants. Tara has requested that Wells Fargo apply the amount on deposit to its loan payments under the confirmed plan, but Wells Fargo has refused to accede to that request.  The Debtor contends that Wells Fargo is Comm 2013's agent and that Comm 2013 has instructed Wells Fargo not to apply those funds to the loan payments.  Because the funds have not been applied to the payments due,

---

[13] Had this Court had the opportunity to address these issues on the front end, similar to what the court did in *Charles Street AME*, a Third Amended Plan clarifying these issues may have been the preferable process.

the Debtor has been unable to make the real estate tax payments pending reimbursement from its tenants for property taxes.

Section 2.4 of the confirmed plan provides, in part, as follows:

Prepetition, every payment made by Tara to Comm 2013 included $13,500.00 for property taxes, and each of the tenants of the Crossings Mall made payments attributable to taxes directly into the Clearing Account of Comm 2013. The proof of claim of Comm 2013 indicates that it is holding sums earmarked by the tenants of the Crossings Mall for taxes. Pursuant to Bankruptcy Code Section 542, Comm 2013 must turn over the funds attributable to taxes that it is holding, as the lien of Comm 2013 does not attach to amounts earmarked by tenants of the Crossings Mall for property taxes, pursuant to UCC Section 9-203. The Confirmation Order shall require Comm 2013 to turnover such sums to Tara to facilitate payment of the Claim of the Sheriff of Kanawha County.

This provision was included in the plan confirmed by Judge Flatley without change or elaboration. This provision is different than what is requested in the counterclaim and third-party complaint, which asks Wells Fargo to apply the funds on deposit against the loan payments due under the plan so the Debtor can presumably free up funds to pay the taxes itself. The Court will enforce this provision as confirmed by the Court and direct the funds to be turned over by Comm 2013 pursuant to Section 2.4 of the confirmed plan.

C. <u>The Lien Release</u>

The Lending Parties have asserted the Lien Release is a cloud on title which needs to be removed. In that regard, the Lending Parties have submitted the Declaration of Bruce A. Toney, an attorney and title agent for First American Title Insurance Company. Having reviewed the Lien Release and reinstatement documents, Mr. Toney asserts that "[f]rom a title perspective, the Lien Release and Reinstatement create confusion with respect to the status of Secured Creditor's interest under the Deed of Trust. I do not believe that a title insurance company would insure Secured Creditor's interest under the Deed of Trust without providing for exceptions to coverage relating to the Lien Release and Reinstatement." Toney Dec., at ¶ 5. A.P. ECF 32.

16

The Debtor has not disputed the Toney Declaration, and the relief the Lending Parties request is appropriately made. However, the Court has a concern. There is no evidence before the Court as to the status of the title to the real property at issue, and if there are any intervening liens, particularly any that may have appeared in the year nothing was of record in the Kanawha County land records. The Court assumes there are no intervening liens or other adversely affected parties, or the Toney Declaration would have pointed that out. If there are intervening liens or property interests, or adversely affected parties, the parties to those liens or interests have a right to be heard. The Court will continue this matter to allow for the Toney Declaration to be supplemented, and if there is no dispute as to this issue, the Court would request the parties to submit a proposed order for recording in the land records that will allow the title company to give a coverage endorsement appropriate under the lender's policy of title insurance. If a sufficient agreed order cannot be obtained, or if there is an intervening lien or interest, or an affected adverse party, the Court shall set this matter for further hearing.[14] The Court would request an update on this matter by counsel scheduling a telephone conference with the Court within thirty (30) days.

D. Post-Confirmation Defaults

The Lending Parties have asked the Court to enter a declaration of post-confirmation default. However, most, if not all, of the post-confirmation defaults they allege derive from the Original Loan Agreement or cash management agreement that are affected by this Memorandum Opinion, or provisions that could be remedied by the payment of real estate taxes upon receipt of

---

[14] The Office of the United States Trustee has not been notably active in this bankruptcy case since confirmation. Perhaps it is time for them to reinsert themselves to monitor the relationship of all counsel and parties, with an eye toward diffusing the extraordinary tensions that permeate this case.

the reserve funds.[15]  The Court will deny the Lending Parties' motion for summary judgment without prejudice on those issues, pending implementation of this Memorandum Opinion and Order.[16]

## CONCLUSION

For all of the above stated reasons, the Debtor's Motion for Summary Judgment is granted in part and denied in part.  The Lending Parties' Motion for Summary Judgment is continued in part and denied in part.  A separate Order will follow.

---

[15] Two alleged defaults cannot be resolved by the payment of real estate taxes: (1) the alleged failure of the Debtor to obtain Comm 2013's approval to enter into a lease agreement ("KFC Lease") with Charter Central, LLC for the construction and rental of a Kentucky Fried Chicken Restaurant under Sections 4.1.9(a) and 4.1.10(b) of the Original Loan Agreement; and (2) the alleged violation of Section 4.1.9(a) of the Original Loan Agreement by entering into the KFC Lease for a period of 25 years in excess of Section 4.1.9(a)'s 15-year term cap.  *See* A.P. ECF 22-3.  The New Loan Agreement does not include similar provisions on seeking approval from Comm 2013 or a lease term cap, but the Court will at this time treat these alleged defaults similarly to the other alleged post-confirmation defaults and deny summary judgment without prejudice.

[16] On July 16, 2021, Comm 2013 filed a Motion to Permit Supplemental Submissions on Summary Judgment as a few of the exhibits it filed in support of its summary judgment motion were filed after the deadline of midnight on June 11, 2021.  Tara filed an objection to such motion asserting that Comm 2013 failed to show excusable neglect for its failure to timely file such documents.  The Court exercises its discretion in this case to allow the late filed exhibits, but admonishes counsel for Comm 2013 that better internal planning and supervision needs to be done to ensure that deadlines are met when set by the Court. They are deadlines — not suggestions or guidelines.  Future stumbles will not be well received.